UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
BROOKE E. FABIAN,

Plaintiff,

-against-

COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION,

Defendant.
---------------------------------------------------------------x

**MEMORANDUM AND ORDER**
25-CV-5864 (OEM)

ORELIA E. MERCHANT, United States District Judge:

On October 20, 2025, Brooke E. Fabian ("Plaintiff") filed this action under 42 U.S.C. § 405(g), seeking judicial review of the Commissioner of the Social Security Administration's ("Defendant") final decision denying her application for supplemental security income ("SSI"). *See generally* Complaint, Dkt. 1 ("Complaint" or "Compl."). Before the Court are the parties' cross-motions for judgment on the pleadings. *See generally* Notice of Motion for Judgment on the Pleadings, Dkt. 12 ("Plaintiff's Motion"); Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings, Dkt. 12-1 ("Pl.'s Mem."); Notice of Cross Motion, Dkt. 14 ("Defendant's Motion"); Memorandum of Law in Support of the Defendant's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings, Dkt. 14-1 ("Def.'s Mem."). Having considered the parties' pleadings, briefs, and the administrative record, the Court denies Plaintiff's Motion and grants Defendant's Motion.

## BACKGROUND

### A. Plaintiff's SSI Application

Plaintiff applied for SSI on October 14, 2021, alleging that she had been disabled since September 17, 2021, due to severe anxiety, depression, cerebral palsy, chronic fatigue,

fibromyalgia, and post-traumatic stress disorder ("PTSD"). *See* Pl.'s Mem. at 6; Administrative Transcript at 88, Dkt. 9–9-7 ("Administrative Record" or "R.").[1] Plaintiff has completed two years of college and worked as an administrative assistant from August 2020 through October 2020, and as a paralegal from August 2021 through September 2021. Pl.'s Mem. at 13; R. at 270. In her function report, Plaintiff stated that she was unable to work due to "pain, chronic fatigue, severe anxiety, depression and PTSD," and reported that these conditions "affect [her] ability to interact with co-workers and clients" both in person and over the phone, and "interfere with [her] ability to complete work tasks." R. at 302. Defendant initially denied Plaintiff's application on October 17, 2022, R. at 105, and again on reconsideration on March 17, 2023, *id.* at 15. Plaintiff subsequently filed a request for a hearing on April 10, 2023, *id.*, and appeared at a telephonic hearing before Administrative Law Judge Patrick Kilgannon ("ALJ") on January 11, 2024, and June 20, 2024. *Id.* at 15, 30.

**B. The ALJ's Findings**

On September 27, 2024, the ALJ denied Plaintiff's application for SSI under Social Security Act § 1614(a)(3)(A). *Id.* at 30. Applying the Social Security Administration's five-step sequential evaluation process, *see* 20 C.F.R. § 416.920(a), the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since October 14, 2021, Plaintiff's application date, R. at 16-17.

At step two, the ALJ determined that Plaintiff experienced the severe impairments of "mood disorder, generalized anxiety disorder, borderline personality disorder, post-traumatic stress disorder, anorexia nervosa, fibromyalgia, chronic pain disorder." *Id.* at 17-19.

[1] When citing to the Administrative Record, the Court refers to the bolded page numbers in the bottom right corner of each page.

At step three, the ALJ found that none of Plaintiff's impairments or combination of impairments met or medically equaled the severity of any impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). R. at 19-21.

At step four, the ALJ assessed that Plaintiff retained the "residual functional capacity" ("RFC") to perform:

> "light work as defined in 20 CFR 416.967(b) except claimant can lift/carry/push/pull 20 pounds occasionally and 10 pounds frequently and can sit 6 hours and stand and/or walk 6 hours in an eight-hour workday. In addition, claimant can perform simple to moderately detailed tasks of up to 4 to 5 step instructions in a routine work setting; would be limited to object-oriented work; could occasionally interact with the general public; and can perform work that does not involve supervising the safety of coworkers or the general public."

R. at 21-28.

At step five, the ALJ determined that Plaintiff has no past relevant work under 20 CFR 416.965, *id.* at 29; however, based on the testimony of the vocational expert, the ALJ concluded that, "considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" such as "price marker … collator operator … and router." *Id.* at 30. Accordingly, the ALJ concluded that Plaintiff "ha[d] not been under a disability, as defined in the Social Security Act, since October 14, 2021, the date [her] application was filed," and, therefore, was not eligible for SSI. *See id*.

The Social Security Administration Appeals Council denied Plaintiff's request for review on August 18, 2025, rendering the ALJ's decision the final decision of Defendant. *Id.* at 1.

### C. District Court Procedural History

On October 20, 2025, Plaintiff commenced this 42 U.S.C. § 405(g) action, seeking review of Defendant's final decision. *See generally* Compl. On December 8, 2025, the Court issued a

scheduling order, *see* Scheduling Order, dated Dec. 8, 2025. In accordance with the schedule, Defendant filed the Administrative Record on January 30, 2026. *See generally* R.

On April 2, 2026, the Court amended the schedule, *see* Order, dated Apr. 4, 2026, after Plaintiff, on consent, moved the Court for an extension of time to file her motion for judgment on the pleadings, *see* Plaintiff's Proposed Amended Scheduling Order with the Consent of All Parties, Dkt. 11. In keeping with the amended schedule, Plaintiff filed her motion for judgment on the pleadings on July 6, 2026, *see generally* Pl.'s Mem., and Defendant filed a cross-motion for judgment on the pleadings on October 2, 2026, *see generally* Def.'s Mem. Plaintiff declined to file a reply brief.

## LEGAL STANDARDS

### A. Judicial Review

A district court's review of an ALJ's decision is limited to determining (1) whether the ALJ's findings are supported by substantial evidence and (2) whether the ALJ applied the correct legal standards. *See* 42 U.S.C. § 405(g).

When assessing whether a decision was supported by substantial evidence, district courts do not review *de novo*. *See Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."). Rather, they "look[] to an existing administrative record and ask[] whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Courts are "required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn,"

*Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)), but "it is up to the agency, and not [district courts], to weigh the conflicting evidence," *Lebby v. Comm'r of Soc. Sec.*, 20-CV-4760 (PKC), 2022 WL 580983, at *7 (E.D.N.Y. Feb. 24, 2022) (quoting *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998)). "Substantial evidence" is less than a preponderance but "more than a mere scintilla" and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quoting *Selian*, 708 F.3d at 417). Under this "very deferential standard of review," district courts can reject an ALJ's factual findings "only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

The Court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "When there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand for further development of the record is appropriate. *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)). A court should grant a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c) "if, from the pleadings, the moving party is entitled to judgment as a matter of law." *Burns Int'l Sec. Servs., Inc. v. Int'l Union, United Plant Guard Workers of Am.*, 47 F.3d 14, 16 (2d Cir. 1995).

**B. Regulatory Framework for Determining Entitlement to SSI Benefits**

SSI benefits are available to individuals who are disabled. *See* 42 U.S.C. § 423(c)(1). A person is disabled if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months[.]" *Id.* § 423(d)(1)(A).

When determining whether an individual is disabled and therefore entitled to SSI benefits, an ALJ employs a "five-step sequential evaluation process." 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At step one, an ALJ considers a claimant's work activity. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If a claimant is performing substantial gainful activity, then a claimant is not disabled, and the inquiry stops there. *Id.* §§ 404.1520(a)(4), 416.920(a)(4)(i). If an ALJ determines that a claimant is not performing substantial gainful activity, the ALJ proceeds to step two, where they determine whether a claimant suffers from "a severe medically determinable physical or mental impairment" or "combination of impairments" that meets the 12-month durational requirement. *Id.* §§ 404.1509, 416.909, 404.1520(a)(4)(ii), 416.920(a)(4)(ii). If a claimant does not have a severe impairment or combination of impairments that meets the durational requirement, then a claimant is not disabled, and the inquiry stops there. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

If an ALJ determines that a claimant does have a severe impairment or combination of impairments that meets the durational requirement, they proceed to step three, where the ALJ considers whether a claimant's medical impairment or combination of impairments appear on a list maintained by the Social Security Administration that defines impairments of sufficient severity as to prevent any gainful activity. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment meets a definition on the list, then the ALJ will find a claimant disabled. *Id.* If not, the ALJ proceeds to step four. *Id.* §§ 404.1520(a)(4)(iii)-(iv), 416.920(a)(4)(iii)-(iv).

At step four, the ALJ evaluates a claimant's past relevant work and determines a claimant's "residual functional capacity" ("RFC"), which is defined as "the most [a claimant] can still do

despite [their] limitations." *Id.* §§ 404.1545(a)(1), 416.945(a)(1); *see id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Work is considered "past relevant work" if a claimant performed the work within the past five years, the work qualifies as substantial gainful activity, and the work lasted long enough for a claimant to learn how to do it. *Id.* §§ 404.1560(b)(1), 416.920(b). If a claimant's RFC permits them to perform past relevant work, they are not disabled, and the inquiry stops there. *Id.* §§ 404.1560(b)(3), 404.1520(a)(4), 416.920(a)(4).

If a claimant cannot perform past relevant work, the ALJ proceeds to step five and determines whether, in light of the claimant's RFC, age, education, and work experience, they can perform other substantial gainful employment. *Id.* §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). While the claimant bears the burden of proof during the first four steps, at step five "the burden shifts to the Commissioner to demonstrate that there are jobs in the national economy that the claimant can perform." *Nieves v. Comm'r of Soc. Sec.*, 20 Civ. 8873 (SLC), 2022 WL 951107, at *7 (S.D.N.Y. Mar. 30, 2022) (citing *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (per curiam)). A claimant who can "make an adjustment to such work" is deemed not disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## DISCUSSION

### A. Substantial Evidence Supports the ALJ's RFC Assessment.

Plaintiff challenges the ALJ's RFC determination as unsupported by substantial evidence. *See* Pl.'s Mem. at 28-30. Specifically, Plaintiff contends that the ALJ "failed to properly evaluate either the supportability or consistency of treating therapist Gabrielle Bruno's [("Ms. Bruno")] opinions" and instead "rejected her detailed functional assessments based largely upon isolated normal mental status findings while ignoring her extensive narrative explanations and longitudinal treatment observations." *Id.* at 22. Plaintiff argues that the ALJ's finding that Plaintiff can perform work at the light exertional level with limitations is not supported by substantial evidence because

the ALJ failed to incorporate or reconcile the limitations assessed by Ms. Bruno and failed to consider the limiting effects of Plaintiff's severe mental impairments and her severe fibromyalgia. Pl.'s Mem. at 21-30. Defendant argues that substantial evidence supports the ALJ's conclusion that Plaintiff could perform work within the scope of her physical and mental RFC. Def.'s Mem. at 14.

The Court finds that the ALJ's evaluation of the medical opinion evidence is supported by substantial evidence. For SSI claims filed on or after March 27, 2017, the applicable Social Security Administration regulations provide that the agency "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the ALJ must "evaluate the persuasiveness," of all medical opinions and prior administrative medical findings based on five factors: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors including, but not limited to, evidence showing that the medical source is familiar with other evidence in the record or has an understanding of the Social Security Administration's policies and evidentiary requirements. *Id.* §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The "most important factors" are the first two: supportability and consistency. *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). The regulations specifically require ALJs to "articulate in [their] determination[s] or decision[s] how persuasive [they] find all of the medical opinions" in a claimant's record. *Id.* §§ 404.1520c(b), 416.920c(b).

Plaintiff alleges that she suffers from several disabilities, including, "mood disorder, generalized anxiety disorder, borderline personality disorder, post-traumatic stress disorder, anorexia nervosa, fibromyalgia, [and] chronic pain disorder, with a disability onset date of November 16, 2020." Pl.'s Mem. at 6. Plaintiff then proceeded to have the following, relevant medical visits:

As to Plaintiff's physical impairments:

- On April 26, 2021, Plaintiff had a telemedicine video visit with internist William Tamparo, M.D. ("Dr. Tamparo"), regarding her anxiety, fibromyalgia, and chronic pain syndrome, and sought a referral for a medical massage as an alternative therapy. R. at 823. At that time, Plaintiff was taking Wellbutrin, Abilify, Pristiq, and Junel FE. *Id.* at 824.

- On June 9, 2021, Plaintiff had an in-person appointment with Dr. Tamparo for a follow up regarding her anxiety, depression, fibromyalgia, and polycystic ovary syndrome ("PCOS"). R. at 825. Plaintiff reported that her fibromyalgia was "semi controlled" with massage therapy, and her depression was "semi controlled" with Wellbutrin, but that she was having difficulty losing weight. *Id.* (cleaned up). Plaintiff's examination was normal except for some cervical tenderness, and Dr. Tamparo prescribed Plaintiff Ozempic for weight loss and referred her to a psychiatrist to discuss medical marijuana or muscle relaxers as potential treatments. *See id.* at 826-27.

- On July 23, 2021, at another follow up office visit with Dr. Tamparo, Plaintiff reported that she had lost weight with Ozempic and was "feeling better" with an increased Wellbutrin dosage. R. at 828. Plaintiff was also taking Abilify, Pristiq, and Junel FE. *Id.* at 829. Plaintiff's examination findings were normal, including normal range of motion and mental status. *Id.* at 829-30. Dr. Tamparo assessed Plaintiff's fibromyalgia, chronic pain syndrome, and PTSD, and prescribed Ozempic, a medical massage for her fibromyalgia, and referred Plaintiff for a psychiatric follow up. *Id.* at 830.

- On February 7, 2022, Plaintiff was seen by Camille Picini, P.A., and discussed her case with Waseem Mir, M.D. ("Dr. Mir") at New York Integrated Rheumatology. R. at 403-06. Plaintiff reported, among other things, longstanding fibromyalgia, asthma, high cholesterol, depression, bad headaches, Osteoporosis, and sought to begin taking Lyrica again due to increasing joint pain. *Id.* Plaintiff complained of PCOS, chronic pain since childhood, a history of an eating disorder, and body dysmorphia. *Id.* at 406. Plaintiff described feeling fatigued, having dry eyes and skin, and cold hands and feet, but reported that her eating disorder had improved. *Id.* Plaintiff's examination findings were normal, including her musculoskeletal and psychiatric exams. *Id.* The physical examination documented no tender points, and Plaintiff was noted to have full range of motion and nontender joints with full muscle strength. *Id.* at 401. Dr. Mir assessed osteopenia and fibromyalgia, prescribed Prednisone, and referred Plaintiff for imaging and blood testing.

*Id.* at 406-07. A subsequent DEXA scan (measuring bone density) was normal, and on February 15, 2022, imaging of Plaintiff's spine, sacrum, and coccyx were normal. *Id.* at 415-16.

- On February 16, 2023, Steven Samuels, M.D., examined Plaintiff in conjunction with her benefits application. R. at 434-37. Dr. Samuels observed that Plaintiff had a normal gait and did not use an assistive device but was unable to walk on her heels and toes. *Id.* at 435. Dr. Samuels stated that Plaintiff had "[m]oderate restrictions reaching overhead using both shoulders, arms, forearms, and hands, prolonged standing, walking, climbing stairs, bending, squatting, kneeling, twisting, turning, crawling, crouching, pushing, pulling, and engaging in strenuous physical activity;" and that she "should avoid smoke, dust, extreme heat, extreme cold, and other respiratory irritants due to history of asthma." *Id.* at 437. Dr. Samuels also reported that Plaintiff had full cervical spine range of motion, limited shoulder, hip, and knee range of motion, full range of motion of her elbows, wrists, and ankles, and no joint deformity, subluxations, contractures, ankylosis, heat, redness, swelling, or effusion. *Id.* at 436. Plaintiff's sensation, reflexes, and strength were all normal with intact hand and finger dexterity and full grip strength. *Id.* at 437.

- On March 26, 2024, Plaintiff was treated by Ayesha Manna, D.O., who diagnosed Plaintiff with fibromyalgia, PCOS, obesity, and eczema. R. at 788-90. On April 4, 2024, Plaintiff was seen again by Dr. Manna who recommended, amongst other things, a low-fat diet to treat Plaintiff's hyperlipidemia, foods with high folic acids, such as leafy greens and citrus fruits, to treat Plaintiff's folate deficiency, limited early morning sun and dietary supplements to treat Plaintiff's vitamin D deficiency, and a high protein diet and supplements to treat Plaintiff's PCOS. *Id.* at 792-97.

As to Plaintiff's mental impairments:

- On December 13, 2020, Jamie Damiani, LMSW, of Gooding Wellness Group, confirmed that she had been treating Plaintiff for anxiety and PTSD since June 23, 2021. R. at 394. Progress notes from September 2021 through September 2022 generally indicate that Plaintiff was noted to be well-kept and euthymic, with appropriate thought and affect. *Id.* at 741-65. Plaintiff reported in September 2021 that she had quit her job, and subsequent sessions through September 2022 document that she discussed issues such as feeling stressed, having some depression and anger towards her father, dating, going for drives with her dog, wanting to work, going on vacation to Florida, and also having a good response to ketamine treatment. *Id.*

- Beginning on November 4, 2021, Plaintiff started seeing psychiatrist Erik Fink, M.D. ("Dr. Fink"). R. at 766. Dr. Fink's treatment notes through September 2023 indicate that Plaintiff was frequently anxious and/or depressed and was treated with Klonopin, Wellbutrin, Xanax, and Pristiq. *Id.* at 766-67. Plaintiff reported having an online shop and was considering working as a makeup artist because she had her certification. *Id.* at 767, 770. Plaintiff also reported that she did a lot around the house, ran errands, saw her grandmother and friends, and generally described varying degrees of anxiety and

depression. *Id.* at 766-77. Plaintiff reported having a good mood response to ketamine injections and, on July 27, 2022, noted that she did not need Xanax. *Id.* at 770.

- On December 19, 2022, Plaintiff reported to Dr. Fink that her mood and anxiety issues were good, she was going out and socializing, and that she had a job interview for an administrative assistant position as she was less anxious about going back to work after previously reporting on October 20, 2022, that she was "petrified" to go back to work. R. at 771-72. In February 7, 2023, Plaintiff reported some exacerbation of her symptoms after having Covid-19, and becoming depressed, anxious, and easily agitated and exhausted. *Id.* at 773. Upon returning to Dr. Fink on March 1, 2023, Plaintiff reported improvement, noting that she had more energy, went to the library and coffee shops, saw a friend once a week, and swam when able. *Id.* at 774. Plaintiff also reported returning to monthly ketamine treatments. *Id.* On May 31, 2023, Plaintiff reported that she was going out to dinner, drawing, writing, and playing video games. *Id.* at 775. Plaintiff also reported that her medications were working "pretty well" for her depression and anxiety, and that she was looking for a new therapist. *Id.*

- On February 16, 2023, psychologist, Paul Spencer Herman, Ph.D., of the New York State Office of Temporary and Disability Assistance Division of Disability Determinations, examined Plaintiff and documented a largely normal exam except that Plaintiff was mildly tense at times and reported not being in a great mood, and she declined to have her attention and concentration tested at that time. R. at 430. Plaintiff reported normal appetite and intermittent treatment, and that she was prescribed Pristiq, Wellbutrin, and Abilify. *Id.* at 429. Plaintiff reported no psychiatric hospitalizations and that she was afraid to leave the house, but that she went out to eat and attended college for two years. *Id.* Plaintiff described herself as anxious and tense with low mood and hopelessness. *Id.*

- On June 22, 2023, Plaintiff was seen for an initial assessment at Central Nassau Guidance and Counseling for anxiety, depression, obsessive compulsive disorder ("OCD"), and PTSD, which purportedly interfered with Plaintiff's daily living. R. at 630. Upon a mental status examination, Plaintiff was anxious and depressed but otherwise had a normal mental status, including full affect, logical thought processes, and normal thought content, as well as normal cognition, insight, and judgment. *Id.* at 632-33. Plaintiff reported a history of passive suicidal ideation, without any plan or intent. *Id.* at 634. Plaintiff also identified good family relationships with her mother and grandmother, a good group of friends, and that she enjoyed artistic activities. *Id.* at 639, 642. On five subsequent dates through July 10, 2023, it was noted that there had been no treatment since the intake and Plaintiff was not responding to messages. *Id.* at 654-58.

- On September 5, and September 28, 2023, Plaintiff described an exacerbation of her symptoms to Dr. Fink; she reported that she had stopped ketamine treatment because she was doing ok, but even after restarting treatment, she was worse than before. R. at 776. Dr. Fink noted that Plaintiff had been on several medications, including Lexapro, Zoloft, Effexor, and Lamictal, in addition to ketamine, and that he had discussed additional treatment options with Plaintiff, including changing antidepressants, augmentation with a second-generation antipsychotic, a mood stabilizer, or thyroid hormone therapy. *See id.* at

776. Dr. Fink also added 25mgs of Cytomel to Plaintiff's list of medications. *Id.* Plaintiff also reported crying and having trouble leaving the house. *Id.* at 777.

- On October 6, 2023, Plaintiff registered for psychiatric services at EPIC Long Island for depression, anxiety, autism, and PTSD. R. at 441-43. On October 13, 2023, at a comprehensive assessment, Plaintiff reported that she lived with her mother, her mother's boyfriend, and her dog, and said that she had difficulty maintaining friendships. *Id.* at 454. Plaintiff indicated that she had written two novels, and enjoyed painting, drawing, and making things. *Id.* Plaintiff described a history of rape and prior treatment with ketamine and was told she should be evaluated for autism spectrum disorder. *Id.* at 458, 468. Diagnostic impressions were bulimia/anorexia nervosa/body dysmorphic disorder, PTSD, autism spectrum disorder, anxiety, and depression. *Id.* at 479.

- On October 16, 2023, a mental status exam conducted by Gabrielle Bruno, MSW, found accelerated activity and anxious mood, but was otherwise normal, including cooperative attitude, full affect, logical thought process, as well as normal perception, thought content, and cognition. R. at 485-88. Plaintiff began counseling and was treated in October and November 2023, with no significant change in her mental status reported or observed. *Id.* at 525-26, 562, 578, 586.

- On January 30, 2024, Plaintiff saw Dr. Fink again and reported that she was alright but had been physically ill, previously had a tough time, and had been working with a therapist who thought she had ADHD. R. at 819. Dr. Fink prescribed a low dose of Vyvanse. *Id.* On March 1, 2024, Plaintiff reported a good response to Vyvanse with increased focus but said that she tended to "crash" in the afternoon. *Id.* at 820. Plaintiff also reported improved mood. *See id.* On March 28, Adderall was added to Plaintiff's treatment, and Plaintiff responded that she felt "fantastic," and that she was smoking marijuana in the evening to help with sleep. *Id.* at 821. Plaintiff also described decreased anxiety, and that she was able to get out and do more. *Id.*

- On April 24, 2024, Ms. Bruno noted during an evaluation that Plaintiff had accelerated activity, was clingy to her parent, had an anxious mood, a racing thought process with flight of ideas, and blamed others for her problems, but had an otherwise normal exam, including grooming, cognition, insight and judgment, and thought content. *Id.* at 807-18.

On December 23, 2023, Ms. Bruno completed a standardized, multiple-choice "Medical Statement of Ability to Do Work-Related Activities (Mental)" form, *see* R. at 722-27 ("Medical Assessment"), in connection with Plaintiff's claim for benefits. Ms. Bruno opined that Plaintiff had "[e]xtreme" limitations in her ability to understand, remember and carry out complex instructions; "[m]arked" limitations in her ability to "make judgments on complex work-related decisions" and interact appropriately with supervisors and the public; "[m]oderate" limitations in

her "ability to make judgments on simple work-related decisions," "interact appropriately with co-workers," and "respond appropriately to usual work situations and [] changes in a routine work setting;" and "[m]ild" or no limitations in understanding, remembering, and carrying out simple instructions. R. at 722-23. In her June 18, 2024 "Medical Assessment of Ability to Do Work Related Activities (Mental)," Ms. Bruno opined that Plaintiff had a "poor" ability to "[u]nderstand, remember, and carry out complex job instructions," "[d]eal with work stresses," "[f]unction independently," and maintain attention and concentration. *Id.* at 784. Ms. Bruno assessed Plaintiff as having depressive disorder, generalized anxiety disorder, and autism spectrum disorder, as well as having difficulty navigating interpersonal skills, with her executive functioning, and managing stress. *Id.* Ms. Bruno further opined that Plaintiff had fatigue, pain, and mood swings, felt overwhelmed, and needed her mother's help. *Id.* Ms. Bruno also indicated that Plaintiff struggled with organizing her thoughts, task initiation, working memory, time management, regulating emotions, and picking up on social cues. *Id.* at 785.

In his decision, the ALJ walked through each medical opinion in detail when determining Plaintiff's RFC. *See* R. at 21-29. As stated above, the applicable regulations require an ALJ to articulate how persuasive they find a given medical opinion based on five factors, the most important being supportability and consistency. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2026). In assessing supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . . the more persuasive the medical opinions . . . will be." *Id.* §§ 404.1520c(c)(1), 416.920c(c)(1). In assessing consistency, "[t]he more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." *Id.* §§ 404.1520c(c)(2), 416.920c(c)(2). The regulation states that the

Social Security Administration "will explain how [it] considered the supportability and consistency factors" and "may, but [is] not required to, explain how [it] considered the [remaining] factors." *Id.* §§ 404.1520c(b)(2), 416.920c(b)(2). When he reached Ms. Bruno's medical assessments, the ALJ discussed both the supportability and consistency factors, finding Ms. Bruno's opinions to be "not entirely consistent with each other" and "unpersuasive as to extreme limitations in understanding, remembering, or applying information and inconsistent with her own exam findings of normal memory." R. at 27. The ALJ further concluded that Ms. Bruno's opinions on Plaintiff's:

> "[p]oor ability or extreme limitations for complex and detailed instructions are not supported since most of the mental status exams, including Ms. Bruno's exams, document normal memory and thought content. Although a moderate limitation in claimant's ability to concentrate and maintain attention is supported by her subjective reports of difficulty focusing, a poor ability to concentrate and maintain attention is not supported since a majority of exams, including Ms. Bruno's exams, do not document any issues in that area. Poor or marked limitations in interacting with others is also not supported since claimant's examiners and Ms. Bruno all documented cooperative behavior and largely normal speech, eye contact, and behavior. Although Ms. Bruno noted in 2024 that claimant has issues with social cues and interpersonal problems, these issues were not identified earlier in the treatment notes. As such, only moderate limitations are supported in claimant's ability to interact with others. There is some indication of moderate limitations in claimant's ability to adapt or manage oneself based upon issues managing stress, performing activities independently, and having some anxiety, but claimant also reported good activities of daily living. As such, moderate or fair limitations are supported by the record and Ms. Bruno's opinions are persuasive in that regard."

R. at 27-28; *see, e.g.*, *Schillo v. Kijakazi*, 31 F.4th 64, 76 (2d Cir. 2022) (affirming that substantial evidence supported an ALJ's determination that a treating physician's opinion was not entitled to controlling weight).

Plaintiff's attempt to undermine the ALJ's finding is unavailing. *See* Pl.'s Mem. at 21-28. Plaintiff acknowledges that treating physicians are no longer accorded controlling weight under the current regulations, *see id.* at 28 ("[T]he treating physician rule no longer applies . . ."); 20 C.F.R. §§ 404.1520c(a), 416.920c(a), but nevertheless advocates for deference that is no longer

required, *see* Pl.'s Mem. at 26 ("The ALJ … failed to meaningfully consider that Ms. Bruno is the only treating source to provide a medical opinion, and that she regularly treated Ms. Fabian over several years … the ALJ appears to have relied primarily, if not exclusively, on the opinion of agency medical expert Joseph Malancharuvil, Ph.D. This was error for several reasons. Dr. Malancharuvil never examined Ms. Fabian . . .") (internal citations omitted). Plaintiff contends that "the ALJ's rejection of Ms. Bruno's well-supported treating opinions in favor of a non-examining expert" requires remand. *See id.* at 27-28. Plaintiff's arguments are without merit.

Here, the ALJ explained that Ms. Bruno's opinions were not supported by her own examination findings, which speaks to the supportability factor, and inconsistent with the mental status findings of other medical sources and her activities of daily living, which speaks to the consistency factor. The Court is not swayed by Plaintiff's attempts to characterize the ALJ's analysis as "conclusory" or "offer[ing] no insight[s]" into the analysis. *Id.* at 23. Further, the fact that the treatment record contains abnormal findings is not inconsistent with the ALJ's conclusions, nor does it establish the existence of mental limitations severe enough to preclude sustained employment. The ALJ's summary of an April 25, 2024 examination by Ms. Bruno states that Plaintiff displayed:

> "accelerated activity, was clingy to her parent, and had an anxious mood, a racing thought process with flight of ideas, and blamed others for her problems, but had an otherwise normal exam, including grooming, cognition, insight and judgment, and thought content."

R. at 25. Thus, the ALJ *did* consider Ms. Bruno's abnormal findings, albeit in the context of other, normal findings. While the ALJ is required to develop the record, "a deficiency in reasoning by a treating physician is not the same as a gap in treatment records." *Schillo*, 31 F.4th at 76.

The Court is likewise unpersuaded by Plaintiff's contention that the ALJ's acknowledgement of Plaintiff's "moderate" limitations in interacting with others, concentration,

persistence, and pace necessarily implicated her ability to stay on task, maintain regular attendance, sustain a full workday, and interact with co-workers and supervisors, and that the ALJ failed to account for those functional limitations in formulating the RFC. Pl.'s Mem. at 29. In *McIntyre v. Colvin*, the Second Circuit held that "the ALJ sufficiently accounted for 'the combined effect of [the claimants] impairments'" where "substantial evidence in the record demonstrate[d] that [claimant] c[ould] engage in 'simple, routine, low stress tasks,' notwithstanding [their] physical limitations and [their] limitations in concentration, persistence, and pace." 758 F.3d 146, 152 (2d Cir. 2014) (quoting *Dixon v. Shalala*, 54 F.3d 1019, 1031 (2d Cir.1995)).

Here, the ALJ expressly limited Plaintiff to work involving only *occasional* interaction with the general public, and no responsibility for supervising the safety of coworkers or the general public. R. at 21. Moreover, the evidence discussed in the ALJ's decision supports the conclusion that Plaintiff's mental impairments did not limit her ability to sustain an ordinary routine or maintain regular work attendance. In particular, Dr. Herman opined that "[t]here appears to be no evidence of limitation with respect to this claimant's ability to . . . sustain . . . ordinary routine and regular attendance." R. at 431. The ALJ further accounted for Plaintiff's mental limitations by restricting her to "simple to moderately detailed tasks of up to 4 to 5 step instructions in a routine work setting" and "object-oriented work." R. at 21. Considered in conjunction with the evidence upon which the ALJ relied, these restrictions sufficiently accounted for the combined effects of Plaintiff's impairments. *See McIntyre*, 758 F.3d at 152. The ALJ's findings of moderate limitations did not, without more, require the inclusion of the additional functional restrictions Plaintiff identifies.

Neither is the Court persuaded by Plaintiff's contention that the ALJ failed to meaningfully consider her fibromyalgia-related symptoms, including her reported difficulty walking and

standing for long periods of time. Pl.'s Mem. at 30. Contrary to Plaintiff's contention, the ALJ expressly addressed her testimony concerning both the nature of her fibromyalgia symptoms and their asserted functional consequences:

> "She testified to fibromyalgia symptoms of body pain in her back, neck, knees, hips, shoulders, and wrists …. she can sit for 10 minutes, stand for 5 minutes, walk a half a block, lift no more than 5 pounds and has trouble reaching and needs to take multiple breaks."

R. at 21-22. The ALJ proceeded to explain why Plaintiff's statements concerning the severity and limiting effects of her symptoms were not entirely consistent with the evidence of record, and supported his conclusion with substantial evidence, which included Plaintiff's activities of daily living:

> "Claimant's reported activities of daily living likewise indicate that she is generally functioning well on a day-to-day basis. Despite testifying to extreme physical and mental limitations, in her adult function report, claimant indicated that she gets up and has coffee and breakfast in the morning, writes or engages in another hobby, goes to the library or coffee shop, comes home, eats lunch, works on hobbies, eats dinner, reads or plays video games, showers, and then goes to bed. She reported no significant barriers to attending to her personal care and indicated that she takes care of her dog, including feeding, bathing, and grooming. She indicated that she can do laundry, dust, and wipe down the table, as well as do light cleaning. Claimant reported that she goes out several times a week, drives, can go out alone and shops in stores, and that her ability to manage finances has not changed. She listed her hobbies as writing, drawing, crocheting, reading, and playing video games, which she does daily. Claimant indicated that she socializes regularly in person, on the phone and by text, and has coffee and meals with family and friends, and that she goes to the coffee shop and library regularly. She reported that she does not use any assistive devices.
>
> Claimant reported to Dr. Samuels that she can cook, clean, and do the laundry with help, she can shower and dress herself, and that she engages in activities, including online social media, playing video games, and socializing with friends."

R. at 26 (internal citations omitted). The ALJ was entitled to consider the nature and extent of Plaintiff's daily activities in assessing the consistency of Plaintiff's allegations concerning the severity and limiting effects of her symptoms. *See Whitmore v. Kijakazi*, 20-CV-08435 (SN), 2022 WL 976964, at *10 (S.D.N.Y. Mar. 31, 2022) ("[I]f a claimant alleges symptoms of greater

severity than established by the objective medical findings, the ALJ should 'consider all available evidence,' including the claimant's daily activities …") (quoting *Cichocki v. Astrue*, 534 F. App'x 71, 75–76 (2d Cir. 2013)); 20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi). The ALJ's discussion thus belies Plaintiff's contention that her fibromyalgia-related symptoms and attendant functional limitations were not meaningfully considered.

In essence, Plaintiff is disputing the ALJ's weighing of the evidence. *See* Pl.'s Mem. at 21-30. However, disagreement about the weight of the evidence is not tantamount to a finding that "a reasonable factfinder would *have to conclude otherwise*." *Brault*, 683 F.3d at 448 (quoting *Warren*, 29 F.3d at 1290); *see also McIntyre,* 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982))); *Bonet ex rel. T.B. v. Colvin*, 523 F. App'x 58, 59 (2d Cir. 2013) ("[W]hether there is substantial evidence supporting the appellant's view is not the question here; rather, we must decide whether substantial evidence supports *the ALJ's decision*." (first citing *Selian*, 708 F.3d at 417; and then citing *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012))).[2]

[2] Specifically, Plaintiff challenges the ALJ's "primar[y], if not exclusive[]" reliance on the opinion of Dr. Joseph Malancharuvil, Ph.D. who, as Plaintiff argues, "never examined Ms. Fabian and did not have access to Bruno's June 18, 2024 medical source statement, which was submitted after the hearing." Pl.'s Mem. at 26. This argument fails, however, for the reasons stated above: the regulations explicitly state that supportability and consistency—not the relationship with the claimant, specialization, or familiarity with other evidence in the record—are the two most important factors in assessing the persuasiveness of a given medical opinion, 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2026), and the ALJ expressly applied those factors here. Otherwise, Plaintiff is challenging the ALJ's weighing of the evidence. Moreover, Dr. Malancharuvil specifically considered the opinions from Ms. Bruno and testified that her opinion as to Plaintiff's extreme limitations were "absolutely inconsistent with the rest of the medical record." R. at 63. Dr. Malancharuvil further testified that her ratings were "not reliable or meaningful" and if accepted at face value would mean that Plaintiff "would be in a hospital setting." *Id.* It was particularly appropriate for the ALJ to have relied on Dr. Malancharuvil's opinion because Dr. Malancharuvil had an opportunity to review Ms. Bruno's opinions and explain why they were flawed. *See Garcia v. Colvin*, 14 Civ. 4798 (BMC), 2015 WL 4603422, at *6 (E.D.N.Y. July 30, 2015) ("Unlike many cases I have seen, this was not a case where the conflicting medical opinions passed each other like ships in the night. [The medical expert] steered his ship directly into plaintiff's treating physicians, and I see nothing so fundamentally wrong with his analysis that the ALJ was precluded from determining that [the medical expert's] opinion survived the collision better.").

Having reviewed the Administrative Record, the Court finds that a reasonable factfinder could have agreed with the ALJ. *Brault*, 683 F.3d at 448. Therefore, the Court upholds the ALJ's evaluation of the medical opinion evidence, which is supported by substantial evidence in the record.

**CONCLUSION**

For the foregoing reasons, Plaintiff's Motion is denied, and Defendant's Motion is granted. Accordingly, the ALJ's decision is affirmed.

The Clerk of Court is directed to enter judgment in favor of Defendant and to close this case.

SO ORDERED.

*/s/*
ORELIA E. MERCHANT
United States District Judge

November 20, 2026
Brooklyn, New York